SATURN TRADING AND TRANSPOR-
TATION CO., LIMITED

v.

BOSTON METALS CORPORATION.

Civ. No. 10053.

United States District Court
D. Maryland.

Oct. 29, 1959.

Arthur E. Tarantino and Paul D. Page, Jr., Washington, D. C., and Logan Cresap, New York City, for plaintiff.

Donald N. Rothman and William A. Grimes, Baltimore, Md., for defendant.

THOMSEN, Chief Judge.

Plaintiff seeks damages from defendant:

(A) For the alleged conversion of the hulk of the steam tanker Saturn, which was sold by plaintiff to Pan American Steamship Company of Panama S. A., by Pan American to defendant, and by defendant to Van Heyghen Freres S. A., of Belgium. Plaintiff contends that there was a clause in the bill of sale from plaintiff to Pan American which should be construed as a condition subsequent, reserving to plaintiff an interest in the hulk; that defendant converted plaintiff's interest when it sold the hulk to the Belgians; and that defendant is liable to plaintiff for the full value of the hulk at the time of the alleged conversion.

In the alternative, if the clause in question should be construed as a covenant on the part of Pan American rather than as a condition subsequent—

(B) For inducing a breach of that covenant by Pan American, giving rise to a liability in tort for the difference between the net amount defendant received from the sale to the Belgians and the amount it paid to Pan American.

Or, if the clause should be construed as imposing an equitable servitude on the hulk in favor of plaintiff—

(C) In quasi-contract, for the same damages as in (B).

The questions to be decided are:

(1) What documents constituted the contract between plaintiff and Pan American, and what did they literally provide?

(2) What is the proper construction of that contract? Should the restrictive clause be construed as a condition subsequent, as a covenant, or as imposing an equitable servitude? Did it effectively reserve to plaintiff any interest in the hulk?

(3) Whether any officer or agent of defendant knew or is charged with knowledge or notice of the terms of the contract between plaintiff and Pan American at the time defendant purchased the hulk?

(4) What remedy, if any, does plaintiff have against defendant under the facts? What damages, if any, did plaintiff suffer?

The evidence offered by plaintiff was most unsatisfactory. It did not produce the executed copy of the bill of sale on which it principally relies, nor account for the failure of its witness Swenson to produce it. Plaintiff's two witnesses, Hanna and Swenson, betrayed little recollection of the important events to which they testified; much of their testimony was a reconstruction of what they believe must or may have happened, induced by leading questions or by looking at whatever documents were handed to them.

I accept as true the testimony of Morris Schapiro, one of the two witnesses offered by defendant, but I do not accept all of the testimony of defendant's witness Chait, particularly as to what happened in the office of Dow & Symmers, attorneys, when the bill of sale from Pan American to defendant was prepared. The failure of either party to produce or take the deposition of Dow leaves many loose ends which must be gathered up by inference.

Facts

In 1947, Mariner Steamship Company, Inc., a New Jersey corporation, purchased the steam tanker Saturn (ex-Annibal) from the United States Maritime Commission. In 1952, Mariner transferred the tanker to plaintiff, a Liberian corporation, having the same ownership and president as Mariner. Pursuant to an agreement known as MA-488, dated July 28, 1952, between Mariner, plaintiff and the Maritime Administration (Maritime), which had succeeded the Maritime Commission, Maritime granted approval[1] of the sale and transfer of the vessel to Liberian registry and flag.

1. As required by secs. 9, 37 and 41 of the Shipping Act of 1916, as amended, 46 U.S. C.A. §§ 808, 835 and 839.

Plaintiff did not produce a copy of MA–488, but it appears from other documents that MA–488 provided in Art. 1A that "there shall be no change in ownership or registry of said vessel * * * without the prior approval of the Maritime Administration" and that, in the event of any default under Art. 1A, Mariner and plaintiff should pay $50,000 to Maritime, as liquidated damages and not as a penalty. Mariner, plaintiff and their surety gave bond to Maritime in the penal sum of $50,000 conditioned upon the faithful performance and observance of all the undertakings, terms and conditions contained in said contract.

The transfer was consummated, and a certificate of Liberian registry was placed on board the vessel. Plaintiff operated the vessel until 1954 when, because of poor business conditions, she was laid up in Jacksonville, Florida.

On January 10, 1955, plaintiff contracted, subject to approval by Maritime, to sell the vessel to Pan American for $250,000, payable $10,000 down and the balance in 24 monthly instalments. At the same time the parties entered into a Bareboat Charter of the vessel, to terminate November 30, 1955, or upon earlier consummation of the conditional contract of sale.

Application for approval was made to Maritime, which, pursuant to Art. 1A of MA–488, approved the proposed sale and transfer on March 10, 1955, good for 60 days thereafter, subject to certain conditions which do not appear to have been complied with. That sale and transfer were not consummated.

Acting under the Charter, Pan American broke the vessel out of Jacksonville, provisioned, equipped and repaired her, insured her for $500,000 on hull and machinery, with 25% additional P. P. I., and put her into trade. Shortly thereafter, about April 1, 1955, the vessel was cast away on Cape Maysi, at the eastern tip of Cuba, and remained stuck on a reef in eight feet of water with her bottom stove in. Plaintiff and Pan American attempted to abandon her to Underwriters, but the abandonment was not accepted. Underwriters employed salvagers to get her off the reef; they towed her to Barracoa, Cuba, where another hurricane put her ashore high and dry. The Underwriters thereupon gave up their attempts at salvage, accepted her as a constructive total loss, and agreed to pay $562,500, which was 90% of the total insurance.

Thereupon, plaintiff and Pan American entered into a contract, which consisted of three papers, all dated October 11, 1955: (1) an Agreement, (2) an Addendum, and (3) a Bill of Sale.

The Agreement provided in clause 1 (a) that $240,000 of the insurance proceeds should be paid to plaintiff, "which is acceptance of the full purchase price pursuant to the agreement of January 10, 1955", and the balance to Pan American; and in clause 2, that plaintiff would simultaneously deliver to Pan American "a bill of sale to the vessel 'Saturn' (or what now remains of her) endorsed 'for the purpose of selling the remnants of said vessel to a United States concern or citizen for scrapping' * * * ".

The Addendum, which was executed the same day, provided for the additional payment of $25,000 by Pan American to plaintiff, "as consideration for the release and settlement referred to in paragraph 3 of the original agreement, except that the *covenant* of Pan American Steamship Corporation concerning the further sale of the hulk of the SS Saturn for scrapping by a United States citizen in accordance with the laws and regulations of the United States without liability for or by Saturn shall survive the making of said payments and delivery of said bill of sale." (Emphasis added.)

What purported to be a copy of the Bill of Sale was offered in evidence. It was not a conformed copy and did not show by whom it was signed, although it had an executed acknowledgment attached to it. Plaintiff's witness Swenson, president of Pan American, testified that the original Bill of Sale was among papers which he had stored in his son's garage, but it does not appear that he ever looked for it or was asked to look

for it by counsel for plaintiff.[2] The copy of the Bill of Sale, after setting forth an absolute and unqualified transfer in the granting clause, contains language in the habendum clause different from either the Agreement or the Addendum, to wit: "To Have and To Hold the Said hulk and all of its equipment aforesaid, for the sole purpose of scrapping, cutting up and dismemberment thereof within the continental limits of the United States and for further sale by it only to an American citizen in accordance with the laws and statutes of the United States." There was no reddendum clause providing for a return of the vessel to the grantor under any circumstances.

It does not appear that any effort was made to secure approval of the sale by Maritime. The Deputy Commissioner of Maritime Affairs of the Republic of Liberia, located in New York, granted permission for the said sale for the purpose of scrapping, provided it was completed within three months. The Liberian certificate of registry was delivered to plaintiff or its attorneys for surrender to the Republic of Liberia in view of the sale to Pan American. There was nothing on the Liberian papers to show that plaintiff had reserved any title or interest in the vessel.

Meanwhile, around the end of August or the first of September, a New York attorney named Dow, acting either as a free lance or as the representative of someone not clearly disclosed by the evidence, had offered the hulk for sale to defendant for $100,000. Those negotiations fell through, but after October 11, 1955, defendant employed Dow to negotiate for it in connection with the purchase of the hulk from Pan American. An understanding was reached between Swenson, president of Pan American, and Dow, representing defendant, in Cuba, for the sale of the hulk afloat in Barracoa. Thereafter, on November 14, 1955, Swenson, Dow and Chait, defendant's vice-president, met in Dow's office in New York. Dow had prepared a draft of a bill of sale, to which Swenson objected. Swenson testified that he had with him the original bill of sale from plaintiff to Pan American and that he told Dow and Chait that the bill of sale from Pan American to defendant had to contain "duplicate wording". Chait testified that Swenson did not show him or Dow any bill of sale from plaintiff, but that Swenson said that because of his obligation to Maritime, he needed a clause that the ship had to be broken up in the continental limits of the United States. Chait further testified that he (Chait) asked if there would be any objection to defendant breaking up the ship outside the continental limits of the United States if defendant obtained Maritime's permission to do so, and that Swenson said "none whatever". Dow then rewrote the bill of sale to provide for the sale of the hulk, "where is as is", for $110,000, with the following pertinent language: "To Have and To Hold the said steel steamship Saturn and appurtenances, unto the said Boston Metals Corporation, its successors and assigns, to the sole and proper use, benefit and behoof thereof, and the said Pan-American Steamship Company of Panama, S. A., hereby expressly makes no warranty or guarantee as to the seaworthiness, description, condition or capacity or otherwise concerning the said steamship and appurtenances except that it, the said Pan-American Steamship Company of Panama, S. A., does warrant its title in and to the said steamship free and clear of mortgages or other hypothecations, for the sole purpose of scrapping, cutting up and dismemberment thereof within the continental limits of the United States and for further sale by it only to an American citizen in accord-

---

**2.** In the suit filed by Pan American against defendant in this court, referred to below, Pan American filed a similar incomplete copy, although that suit was filed before Swenson stored his papers. The ultimate finding of fact as to whether the Bill of Sale was originally executed in this form requires a consideration of subsequent events set out below.

The papers were executed in New Jersey, to avoid the New York sales tax.

ance with the laws and statute of the United States."

I find that the truth lies somewhere between the testimony of the two witnesses; that Swenson brought with him either the original bill of sale from plaintiff to Pan American or some copy or memorandum thereof; that whether or not Chait saw that paper he had an opportunity to see it; that Dow saw it; that defendant is charged with knowledge of its contents; that defendant had such notice of the provisions of the agreement between plaintiff and Pan American as put defendant on inquiry and charges it with notice or knowledge of the terms of that agreement, whatever they were; but that Swenson did not suggest that either plaintiff or Pan American was reserving any title or equitable property interest in the hulk, or that a sale by defendant to foreign interests would work a forfeiture. This Bill of Sale was also executed in New Jersey. Swenson notified his insurance broker of the transfer of interest in the hulk. He said nothing to the broker about any interest of plaintiff therein, because, he testified, plaintiff "had no interest".

After the papers were signed Dow sent bills to both sides. Defendant paid him a finder's fee of $5,000. When Swenson heard of that he refused to pay Dow anything, although theretofore he had apparently intended to pay him something, whether as a commission or a fee for professional service, or both, is not clear.

Defendant engaged the Moran Towing Company to tow the hulk to Baltimore at a cost of $15,000, and spent $495 for raising anchors and chains. In the middle of January, defendant sold the hulk to Van Heyghen Freres S. A., of Ghent, Belgium, for $210,000 subject to Maritime approval. Defendant spent $17,850 to prepare the hulk for ocean towage, and spent $1,000 to $1,500 for miscellaneous expenses. The hulk left Baltimore about March 4, 1956, and was scrapped in Europe.

Meanwhile, in late January or early February, 1956, Hanna, the president of both plaintiff and Mariner, visited defendant's office in Baltimore and talked to Morris Schapiro, defendant's chairman, and to Chait. Hanna had heard that defendant was proposing to sell the hulk to foreign interests, to be broken up outside the United States, and wanted to protect his companies from a claim on their bond by Maritime. He also was looking for certain papers. Hanna told Schapiro and Chait that the only thing he was interested in was "that he should not be penalized on his bond". He made no claim of any ownership interest in the vessel. He was satisfied with an assurance that defendant would not transfer the hulk foreign without obtaining permission from Maritime, and putting up whatever bond might be required to relieve plaintiff's bond.

On January 23, 1956, defendant applied to Maritime for approval of the sale to the Belgians. On February 24, 1956, Maritime granted this approval following an agreement dated February 18, 1956, between Maritime and defendant, which recited that a *previous* transfer of said vessel may have given rise to a cause of action by Maritime against plaintiff, Mariner and their surety, under the bond referred to above, and contained certain promises by defendant not material to the issues in this case.

Meanwhile, on February 20, 1956, Maritime had made demand on plaintiff and Mariner and their surety under the bond, alleging a breach of MA–488 in that there had been several changes of ownership of the vessel without the prior approval of Maritime. Maritime did not make any claim on the bond based on the transfer to defendant. On February 23, Tarantino, one of the attorneys for plaintiff, wrote defendant enclosing copy of part of a letter he had written to Maritime, and advising defendant "of the interest of my client in the S.S. Saturn and of your qualified ownership therein as recited in the Habendum Clause of the Bill of Sale given by my client to the corporation which sold you the hulk and

as recited in the Habendum Clause of the Bill of Sale given to you by Pan-American at the time you purchased the hulk from them." This was the first time that anyone on behalf of plaintiff had ever suggested to Maritime, to the Republic of Liberia, to defendant, or to anyone else, that the plaintiff had any property interest in the hulk.

The attorney's letter continued: " * * * all you purchased and own is the property right to scrap the hulk in the United States. You have a conditional title in the hulk which does not become absolute until you have satisfied a condition subsequent and that is the scrapping of the hulk in the United States. You are required to scrap the hulk in the United States. * * * you will be held strictly liable for any damage which may accrue to my client by virtue of your actions and you (sic) conduct or failure to scrap the hulk in the United States as required in the Bills of Sale."

The claim of Maritime against plaintiff, Mariner and their surety was settled by Hanna paying $500 personally to Maritime. No payment was made by either plaintiff, Mariner or their surety.

Hanna testified that he does not know whether plaintiff ever made any demand on Pan American for breach of the agreement of October 11, 1955. He left that to his attorneys without any instructions one way or the other. Hanna and Swenson discussed a possible suit against defendant. Swenson thought it was going to be a joint suit, but plaintiff's attorneys, Cresap and Tarantino, on behalf of Pan American alone, filed an action in this court against defendant.

In its complaint Pan American recited the material portions, quoted above, of the bill of sale from plaintiff to Pan American and of the bill of sale from Pan American to defendant. As originally drawn, the complaint then alleged that Pan American (plaintiff *therein*) is obligated to the former owners of the hulk (including plaintiff *herein*) to save them harmless from any claim under the bond given by the former owners to Maritime in connection with MA–488, and quoted those portions of Art. 1A and 1D of MA–488 which are set out above. The complaint further alleged that defendant knew or had reason to know of MA–488 and of Pan American's responsibility in the premises; that by disregarding and violating the provisions of the bill of sale from Pan American to defendant, defendant had caused Maritime to make demand upon the said bond; and that if any liability exists under said bond Pan American is liable to the former owners for the amount of such liability, plus damages and expenses. The complaint concluded by alleging that defendant had wrongfully converted to its own use the interest in said hulk reserved to or retained by Pan American, and claimed damages of $175,000 plus.

Various motions were filed by Pan American and by defendant, which came on for hearing before Judge Watkins. Plaintiff then withdrew from the complaint all paragraphs which referred to the bond, thereby submitting to the court the question whether the bill of sale from plaintiff herein to Pan American and from Pan American to defendant "contained conditions subsequent binding upon the defendant, and whether there had been a breach of such conditions subsequent by the defendant."

It should be noted that Judge Watkins did not have before him the Agreement or the Addendum which formed part of the October 11, 1955, contract between plaintiff herein and Pan American.

On that record, Judge Watkins filed an opinion (unreported) in which he said that the habendum clause in the bill of sale from plaintiff to Pan American "would appear to be apt language to impose a condition subsequent, but, for the reasons hereinafter stated, it is unnecessary to make an express ruling upon the point."

He continued: "It seems entirely clear to me that whatever may have been the effect or construction to be given to the habendum clause in the transfer from

Saturn to Pan American, the habendum clause in [the] bill of sale from Pan American to the defendant does not contain a condition subsequent but a limited warranty for a specific purpose intended to be for the benefit of and to protect the defendant, rather than the plaintiff."[3]

Judge Watkins concluded:

"There are allegations in the complaint that the defendant purchased with knowledge of the transaction between plaintiff (Pan American) and its predecessor in title. If this were so, and if there had been a breach of the conditions in the bill of sale from the plaintiff's predecessor to plaintiff, and if this could be relied upon as a breach by the defendant, I find that that would be available only to Saturn, plaintiff's predecessor in title, without expressing an opinion as to whether the alleged conduct of the defendant would constitute a breach of the conditions of the first bill of sale.

"I therefore find that the complaint, exclusive of paragraphs 12, 13, 14 and 15 which have been eliminated by the stipulation fails to state a cause of action against the defendant. * * *

"I will sign an appropriate order dismissing the complaint without prejudice."

Such an order was signed and filed.

Thereafter, the same attorneys brought the present action on behalf of plaintiff herein.

## Discussion

### (1)

Although the evidence is unsatisfactory and leaves considerable doubt in my mind, I find from a preponderance of the evidence that the copy of the Bill of Sale from plaintiff to Pan American which was produced by plaintiff is a true copy of the original Bill of Sale. It must be read, however, in connection with the Agreement and the Addendum, executed on the same day, since the three papers constituted a single contract.

### (2)

The language in the habendum clause of the Bill of Sale from plaintiff to Pan American might be considered a condition subsequent, or a covenant, or as imposing an equitable servitude. American Law of Property, Vol. 1, sec. 4.7. Judge Watkins said that it "would appear to be apt language to impose a condition subsequent", but found it unnecessary to make an express ruling on the point. As noted above, however, Judge Watkins did not have before him the Agreement or the Addendum, nor did he have the benefit of the other evidence offered in the instant case.

When the three papers are read in the light of plaintiff's obligations to Maritime under MA–488 and the bond, and of the situation of the parties on October 11, 1955, it is clear that Hanna's only interest was to protect plaintiff against claims on its bond, and that the three papers were prepared with this

3. Judge Watkins added: "Specifically, I find and hold that the habendum clause in the bill of sale from plaintiff to defendant expressly negatives any warranty or guaranty as to the seaworthiness, description, condition or capacity or otherwise concerning the steamship and appurtenances, but that it does warrant the title of Pan American in and to such steamship free and clear of mortgages or other hypothecations for the sole purpose of scrapping, cutting up and dismemberment thereof within the continental limits of the United States and for further sale by it only to an American citizen in accordance with the laws and statutes of the United States; that is, as

I construe the habendum, that which had been acquired by the plaintiff as a hulk is sold by it as a steel steamship, but no warranty with respect to the steamship as such is given, but in fact it is expressly negatived. However, should the defendant cut up and scrap the steel steamship within the continental limits of the United States and for further sale by it only to an American citizen in accordance with the laws and statutes of the United States, the plaintiff then warrants to the defendant that plaintiff's title in and to said steamship for that purpose is free and clear of mortgagee or other hypothecations."

purpose in mind. This conclusion is confirmed by the statement made by Hanna to Schapiro and Chait, by the statement made by Swenson in Dow's office, by everything else plaintiff and Pan American did before Tarantino's letter in February, 1956, and even by the allegations in the complaint filed on behalf of Pan American by plaintiff's own attorneys.

In Hale v. Finch, 104 U.S. 261, 26 L.Ed. 732, cited by plaintiff, the language of the bill of sale, the purpose of the clause, and the situation of the parties were all quite different from the instant case. The court held that the language used in the bill of sale in that case created a condition and not a covenant.

In the instant case, the Addendum refers to the obligation of Pan American as a "covenant" and there is no reddendum clause in the Bill of Sale or other language in any of the documents to indicate that the parties intended the clause to create such a condition subsequent as would work a forfeiture. A. L. I. Restatement, Property, sec. 45; 19 Am.Jur., Estates, sec. 64.

■ Whether the clause be considered as a condition subsequent, as a covenant, or as imposing an equitable servitude, it must be construed in the light of its purpose. Any greater restraint than is necessary to accomplish that purpose would be unreasonable and should not be enforced. Restatement, Property, sec. 406; 19 Am.Jur., Estates, secs. 63, 65, 71; American Law of Property, Vol. 1, sec. 4.7. Under the facts of this case, it would be most unjust to construe the language of the bill of sale as reserving any title in plaintiff or as creating a condition, the breach of which would work a forfeiture of the vessel by defendant to plaintiff.

### (3)

I have found, under "Facts", supra, that defendant was charged with knowledge or notice of the terms of the contract between plaintiff and Pan American at the time defendant purchased the hulk. However, Chait was told, by Swenson then, and by Hanna later, that the purpose of the clause would be served if he obtained permission from Maritime to sell the hulk for breaking up abroad.

### (4)

■ Plaintiff contends (a) that defendant converted the hulk by selling it to the Belgians, and is, therefore, liable to plaintiff for its fair value at the time of such sale, i. e. the full purchase price, $210,000. For the reasons set out in (2) above, that contention is without merit.

■ Plaintiff's alternate contentions are (b) that defendant is liable to plaintiff in tort for inducing a breach by Pan American of its covenant with plaintiff, (c) that the contract between plaintiff and Pan American imposed an equitable servitude on the hulk in favor of plaintiff, and that under either theory defendant is liable to plaintiff for the difference between the net amount defendant received from the sale to the Belgians and the amount defendant paid to Pan American.

If the sale by defendant to the Belgians had been treated by Maritime as a breach of plaintiff's obligations to Maritime secured by plaintiff's bond, plaintiff would have a cause of action against defendant, and would be entitled to recover any damages which it suffered thereby, whether in tort for inducing a breach of contract, or in quasi-contract on some theory of equitable servitude, need not be decided in this case. Plaintiff concedes, however, that Maritime's claim (which was settled for $500) was not based on the sale by plaintiff to the Belgians, which had been approved by Maritime, but on certain prior transfers, with which defendant had nothing to do.

Defendant complied with the requirements of its contract with Pan American and with the requirements of the contract between Pan American and plaintiff by obtaining permission from Maritime for the sale of the vessel foreign, thereby preventing any claim by Maritime against plaintiff or its bond by reason of such sale.

Plaintiff has suffered no damage as a result of the sale by defendant to the Belgians. By bringing the hulk to Baltimore and fitting it for a trans-Atlantic tow, at a total cost of some $35,000, and by obtaining Maritime approval of the transfer, defendant was able to sell the hulk at a price above the $110,000 it paid to Pan American. If plaintiff had been willing to take the same chances it might have made the same profit. Its contention that the purpose of the clause in the Bill of Sale from plaintiff to Pan American was to enable it to negotiate for a part of that price was an afterthought. Its argument that "the deliberate 'outsmarting' tactics of defendant surely make exemplary damages appropriate" is the whine of a dog that would like to be in the manger in order to exact a high price for jumping out.

Judgment for defendant, with costs.